UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| DURAPLAS, LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. _____ |
| | ) | |
| DIVERSITECH CORPORATION, | ) | **JURY DEMAND** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

DuraPlas, LP ("DuraPlas" or "Plaintiff"), by and for its Complaint against Defendant DiversiTech Corporation ("DiversiTech" or "Defendant"), alleges to the Court as follows:

### NATURE OF THE CASE

1.     This action seeks to stop an incumbent, entrenched monopolist from unlawfully preserving its dominance and excluding a smaller, innovative competitor from the market for plastic heating, ventilation, air condition, and refrigeration ("HVAC/R") pads in the United States.

2.     DuraPlas is a small but growing new entrant that embraces fair competition through innovation, pricing, product quality, and customer service. DiversiTech is a different type of company. Rather than embracing fair competition, DiversiTech exploits its near-total chokehold on the market through the significant financial backing of its private equity sponsor. DiversiTech suppresses competition through a campaign of exclusionary, tortious, and illegal conduct.

3.     DiversiTech has long enjoyed monopoly power in the market for HVAC/R pads, a position it secured not through superior innovation or efficiency, but through consolidation and coercive, bullying tactics.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                        **PAGE 1**

4.     Now, faced with DuraPlas's entry and growing traction with customers, DiversiTech has doubled down to ensure its continued dominance, leveraging de facto exclusive dealing arrangements, threatening distributors with legal liability, and abusing intellectual property rights to deter any distributor engagement with DuraPlas. This conduct has chilled competition and deprived distributors and end customers of meaningful choice.

5.     DuraPlas brings this case not only to remedy its own injuries, but to vindicate the principle that customers—not monopolists—should determine the winners and losers in a competitive market. DiversiTech's stranglehold has created a climate of fear among distributors and end customers, many of whom would prefer to use cheaper, better quality, and more innovative alternatives but are reluctant to do so given DiversiTech's abusive and coercive tactics. DuraPlas seeks to open the market and to ensure that fair competition on the merits is restored so that it dictates market outcomes, not unlawful exclusion.

6.     This case thus presents a straightforward but urgent claim: a dominant company has crossed the line from competing to coercing, unlawfully stifling competition over the years through acquisitions and other conduct, and now using coercive and fraudulent activities to block the only legitimate competition that remains in the market from gaining a foothold, harming competition and customers desiring lower prices, higher quality, and greater innovation. DuraPlas asks this Court to enforce the antitrust and intellectual property laws, protect fair dealing, and reestablish the conditions under which open and lawful competition can thrive.

## THE PARTIES

7.     DuraPlas is a limited partnership organized and existing under the laws of the State of Texas, with a principal place of business located at 16400 Midway Road, Addison, Texas 75001.

8.     DuraPlas is an American manufacturer of high-quality plastic components serving diverse industries, including agriculture, energy, logistics, and horticulture. With a workforce of

approximately 150 employees and a single, state-of-the-art manufacturing facility in Addison, TX, DuraPlas prioritizes innovation, durability, and customer-focused solutions. In late 2022, drawing on its deep engineering expertise in high-performance plastics, DuraPlas entered the HVAC/R sector with the launch of the PolarPad line of plastic pads for installing HVAC/R systems.

9.      DuraPlas is informed and believes that DiversiTech is a corporation formed and existing pursuant to the laws of the State of Georgia with its principal place of business located at 3039 Premier Parkway, Suite 600, Duluth, GA 30097.

10.      DiversiTech is a large, multi-brand manufacturer of HVAC/R components and related products, with a product portfolio spanning equipment pads, electrical fittings, condensate pumps, HVAC tools, and other installation accessories. Upon information and belief, DiversiTech employs over 1,000 individuals across the United States, Canada, and the United Kingdom. DiversiTech refers to itself as "North America's largest manufacturer of equipment pads," offering an array of concrete and plastic pads for installing HVAC/R systems.

11.      In 2021, DiversiTech was acquired by Partners Group, a Swiss private equity firm managing over $135 billion in assets, in a transaction reportedly valued at approximately $2.2 billion, providing DiversiTech with further access to capital, resources, and an international supply and logistics infrastructure.

## JURISDICTION AND VENUE

12.      This an action at law and in equity that arises under the antitrust laws of the United States (15 U.S.C. §§ 1 and 2, *et seq.,* 15 U.S.C. § 14), the patent laws of the United States (35 U.S.C. §§ 1, *et seq.*), and the Declaratory Judgment Act (28 U.S.C. §§ 2201 and 2202).

13.      This Court has subject matter jurisdiction over the antitrust claims pursuant to 28 U.S.C. §§ 1331 and 1337(a), and under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking monetary and injunctive relief (including treble damages) from DiversiTech for violating,

and to prevent and restrain Defendant from violating, Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14, and supplemental jurisdiction over the overlapping claims arising under the common law of the State of Texas pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy.

14.    This Court also has subject matter jurisdiction over the patent-related claims for declaratory judgment pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202. For example, without limitation, this Court can provide the declaratory judgment relief sought in this complaint because an actual case and controversy exists between the parties within the scope of this Court's jurisdiction pursuant to 28 U.S.C. § 2201. A real, live, immediate, and justiciable case and controversy exists at least because DiversiTech has accused DuraPlas of infringing one or more claims of the patents-in-suit, both via direct communications with DuraPlas occurring in this District and, upon information and belief, via communications with DuraPlas customers.

15.    DiversiTech engages in, and its activities substantially affect, interstate commerce. For example, without limitation, DiversiTech sells and distributes concrete and plastic HVAC/R pads and other products to numerous customers located both in the District and throughout the United States.

16.    DiversiTech has established sufficient minimum contacts with this District such that DiversiTech is subject to specific personal jurisdiction in this District. Further, the exercise of personal jurisdiction based on these pertinent contacts does not offend traditional notions of fairness and substantial justice. For example, without limitation, DiversiTech has consciously and purposefully directed allegations of patent infringement of the patents-in-suit and related patents

toward DuraPlas, an entity organized under the laws of Texas and having its principal place of business in this District.

17.     Venue properly lies in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and with respect to claims arising under the antitrust laws pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, because, at a minimum, DiversiTech is subject to personal jurisdiction in this District. Furthermore, DiversiTech transacts business in this District by regularly selling and distributing concrete and plastic HVAC/R pads within it.

**FACTUAL BACKGROUND**

**A. Industry Background**

18.     "HVAC/R" stands for "heating, ventilation, air conditioning, refrigeration." The term refers to mechanical systems controlling temperature, air quality, and refrigeration in buildings.

19.     Outdoor HVAC/R equipment typically must be installed on stable surfaces (commonly referred to in the industry as "pads") to ensure proper operation and compliance with local building codes related to safety and performance.

20.     Since at least the 1950s, concrete was the standard material used for HVAC/R pads. Concrete provides a stable, level base for outdoor units and offers protection against ground moisture, pests, and soil erosion. Its substantial weight helps prevent equipment movement due to vibrations or environmental factors.

21.     But concrete pads also present challenges. Their heavy weight often requires multiple installers or machinery to position, and they are less suitable for remote installations where transport is difficult. Additionally, concrete is brittle and prone to cracking in environments with high moisture, freeze-thaw cycles, or unstable soil.

22.     As a result, concrete pads are considered by end customers to be a suboptimal solution in certain use cases—particularly residential projects, remote locations, moisture- or frost-prone areas, or where labor efficiency is a priority.

23.     In these circumstances, end customers prefer lightweight, durable pads made of (high-density polyethylene or polypropylene) plastic. These plastic pads began to appear in the early 2000s to reach customers looking for the benefits that only plastic pads could provide.

24.     As discussed below, material differences between concrete and plastic pads result in distinct performance profiles. These differences cause each to serve different technical and logistical needs and make them preferred in different installation scenarios depending on the use case.

25.     The ultimate end customers of concrete and plastic pads are individuals or entities who install HVAC/R pads in connection with new construction or building modifications. These projects may involve single-family or multi-family residential properties, as well as larger commercial or mixed-use buildings. The majority of such end customers are building contractors, although some homeowners make purchases with contractors or as part of do-it-yourself ("DIY") installations.

26.     Upon information and belief, end customers rarely buy pads directly from manufacturers. Instead, manufacturers typically sell their products at wholesale to large regional or national distributors, many of which are members of consolidated buying groups. These primary distributors or group members may supply pads directly to contractors or other end customers or may further distribute through smaller secondary distributors. As a result, the distribution system is layered, but access to the end customers primarily lies in the hands of a concentrated number of large-volume intermediaries, whose demand for pads reflects the demand of end customers.

27.    Given the structure of the distribution chain, pad manufacturers typically make sales in large volumes, particularly in the spring and summer season. Rather than fulfilling small, continuous orders, manufacturers supply bulk quantities to larger distributors who manage downstream distribution to end customers, who generally purchase at much smaller quantities. This bulk purchasing model, driven by the logistics and inventory management practices of major distributors, results in fewer transactions but at higher volumes per sale.

## B. Relevant Market, Market Power, and Monopoly Power

### i.    Relevant Product Market

28.    For purposes of the antitrust claims, the relevant product market is plastic pads used to mount outdoor HVAC/R units.

29.    Plastic pads are distinct from, and not reasonably interchangeable with, concrete pads used to mount outdoor HVAC/R units. They serve different technical and logistical needs and end customers therefore prefer them in different installation contexts. As noted above, the majority of such end customers are building contractors, although some homeowners make purchases with contractors or as part of do-it-yourself ("DIY") installations.

30.    Plastic pads offer a materially distinct performance profile from concrete. Engineered from high-density polymers, plastic pads resist degradation from ground moisture, chemical exposure, and UV radiation. Their molded structure provides consistent leveling support, while internal ribbing or structural cores enhance strength and help distribute weight evenly, which minimizes the risk of settling or shifting due to environmental stress or equipment vibration. Plastic pad installation also tends to be less labor intensive, making it easier and cheaper to install relative to concrete.

31.    These differences in performance profile have resulted in plastic pads and concrete pads being preferred for distinct use cases.

32.     End customers largely prefer concrete pads over plastic pads where the project involves large or heavy commercial units, hurricane or high-wind zones, locations where local codes mandate heavy base anchoring, or sites with minimal handling constraints.

33.     In contrast, end customers largely prefer plastic pads over concrete pads in other use cases, including but not limited to when the project involves single- or multi-family residential units, installation in remote locations where transport is difficult, areas with moisture, freeze-thaw, or soil instability concerns, or where costs are a particular concern.

34.     Distributor (and end customer) responsiveness to changes in the relative pricing of concrete pads and plastic pads provides further evidence that plastic pads are distinct from, and not reasonably interchangeable with, concrete pads. Generally, the all-in cost to buy and install a concrete pad is significantly higher than a similarly sized plastic pad. If concrete pads and plastic pads were reasonably interchangeable, one would expect a 5 to 10% increase in the all-in cost of concrete pads to cause customers to switch to plastic pads. But, upon information and belief, customers of concrete pads are highly unlikely to switch to plastic pads when faced with a meaningful increase in the all-in cost of concrete pads of 5% to 10% or more. Based on DuraPlas's experience in the sales of plastic pads, significant increases in the all-in cost of concrete pads would not result in a meaningful number of sales to be diverted to DuraPlas's plastic pads (and, upon information and belief, to DiversiTech's plastic pads). Similarly, DuraPlas believes that a 5% to 10% increase on plastic pad prices would not result in a meaningful number of sales to be diverted to concrete.

35.     Plastic pads are sold in a variety of sizes, weights, and load capacities to accommodate different units and conditions. But even when different pad models are not direct

substitutes, they are sold under similar competitive conditions and can be aggregated into a single product market for analytical purposes.

## ii.    Relevant Geographic Market

36.    For purposes of the antitrust claims, the relevant geographic market for plastic HVAC/R pads is the United States.

37.    Plastic HVAC/R pads sold in or into the U.S. are designed to reflect domestic regulatory standards, logistical constraints, and commercial purchasing behavior.

38.    Most HVAC/R contractors and distributors source plastic pads domestically due to high shipping costs relative to unit value, the need for rapid delivery, and compliance with U.S. installation and building codes.

39.    In addition, product specifications (such as pad dimensions, material composition, and weight tolerances) are often aligned with U.S. industry norms and climate conditions.

40.    Foreign manufacturers face practical entry barriers, including distribution network limitations, practical difficulties involved in shipping large plastic products over very long distances, and international trade barriers, which further support the conclusion that competition occurs predominantly on a national scale.

## iii.    Market Power and Monopoly Power

41.    DiversiTech and DuraPlas are the only two significant competitors in the manufacture of plastic HVAC/R pads sold in the United States, resulting in a highly concentrated market with limited alternatives for distributors and end customers.

42.    Of the two, DiversiTech is the dominant incumbent, having offered plastic pads since at least the early 2000s. DiversiTech possesses monopoly power (or at minimum, substantial

market power) sufficient to control prices, restrict output, and exclude competitors from the plastic pad market.

43.     A handful of other competitors (such as Rectorseal, Bramec Corporation, and Cambridge Resources) also manufacture plastic HVAC/R pads in the United States. Upon information and belief, these companies hold only a negligible share of the market. Upon information and belief, unlike DiversiTech or DuraPlas, they largely rely on third party contract manufacturers to produce their plastic pads and lack the capability to directly manufacture plastic pads at scale. Upon information and belief, they further lack the capital, scale, and distribution infrastructure necessary to meaningfully compete with DiversiTech—particularly in light of the exclusionary, tortious, and unlawful conduct described throughout this Complaint, which further insulates DiversiTech's dominant position from competitive threat.

44.     DiversiTech's entrenched market position provides both direct and circumstantial evidence of monopoly power.

45.     Upon information and belief, prior to DuraPlas's entry into the market in late 2022, DiversiTech accounted for approximately 90% of all plastic HVAC/R pad sales in the United States. Such overwhelming market share is strong evidence of monopoly power under established legal and economic standards.

46.     DiversiTech did not obtain this dominant share through competition on the merits. Instead, early in the introduction of plastic pads to customers, DiversiTech, which was already a dominant player in concrete pads, consolidated the market through a series of "roll-up" acquisitions, systematically eliminating rival competing lines and reinforcing its market control.

47.     Upon information and belief, in 2007, DiversiTech acquired assets to The Black Pad line of plastic pads from PolyVulc USA, Inc.

48.     Upon information and belief, in 2009, DiversiTech acquired the DuraGrid, EcoPad, and StayRite lines of plastic pads from Oldcastle Infrastructure.

49.     Upon information and belief, in 2009, DiversiTech also acquired the Hef-T-Pad line of plastic pads from NDS, Inc. ("NDS"). This acquisition served as the foundation for DiversiTech's subsequent threatened assertion of fraudulently obtained patents against DuraPlas, as further detailed below.

50.     DiversiTech's pricing conduct further evidences its monopoly power. In early 2021, the industry experienced a temporary supply shock due to unusually cold weather in the Gulf Coast that disrupted petrochemical production. Upon information and belief, DiversiTech responded by raising prices, citing increased input costs. Upon further information and belief, after supply conditions normalized, DiversiTech maintained those elevated prices. Its ability to sustain supracompetitive pricing in the absence of cost justification without meaningful customer attrition demonstrates pricing power unrestrained by normal competitive forces. Such pricing rigidity is a textbook indicator of monopoly power.

51.     Significant barriers to entry into the plastic pad market provide additional evidence of DiversiTech's durable monopoly power.

52.     For example, the manufacture of plastic pads is highly capital intensive. It requires substantial investment in high-tonnage injection molding machines, custom tooling, and specialized production facilities. These high fixed and sunk costs deter new entrants, insulate the incumbent from competitive threats, and enable the exercise of pricing power above competitive levels.

53.     In addition, the manufacture of plastic pads demands specialized technical expertise, including knowledge of polymer chemistry, material science, and advanced

manufacturing processes. Producing high-quality plastic pads that meet regulatory standards for durability, weight tolerance, and environmental resistance requires experienced engineers and technicians skilled in areas such as injection molding, thermoforming, and compound formulation. Moreover, understanding the unique characteristics of different plastic materials requires a deep technical know-how that new entrants may struggle to acquire quickly. This specialized expertise not only elevates production costs but also creates a steep learning curve for any would-be competitors, further reinforcing the barriers to entry and solidifying DiversiTech's dominant position in the market.

54.     In this case, intellectual property protections constitute another barrier. DiversiTech holds patents covering key product features, structural designs, and manufacturing methods, as well as trade secrets involving proprietary polymer blends, tooling configurations, and process optimizations. These IP protections restrict potential competitors from developing competing products without risking litigation, thereby limiting the scope of permissible market entry and entrenching DiversiTech's monopoly power.

55.     These substantial barriers to entry limit the number of feasible potential entrants to no more than a small group, including DuraPlas.

56.     DuraPlas, which already manufactures innovative, high-performance plastic products in other industries, entered the plastic HVAC/R pad market in late 2022 in response to a clear and persistent opportunity arising from the absence of effective competition in this market. At the time of entry, DiversiTech's near-total control of the market indicated a lack of meaningful competitive discipline, resulting in elevated prices and limited customer choice. DuraPlas recognized the market for plastic HVAC/R pads as a lucrative opportunity for disruptive entry. This opportunity, created by DiversiTech's early consolidation and unchecked market power,

prompted DuraPlas to invest in product development and distribution to challenge DiversiTech's anticompetitive chokehold of this market.

57.    Upon information and belief, DuraPlas's entry in late 2022 quickly reduced DiversiTech's market share to approximately 75% to 80%, but after this initial success, DuraPlas has been unable to further contest DiversiTech's share. But for DiversiTech's anticompetitive, tortious, and illegal conduct described below, DuraPlas would be able to contest an even greater portion of DiversiTech's share, adding greater pressure on DiversiTech to lower prices and enhance its offerings to distributors and end customers.

58.    In order to exclude DuraPlas and other potential competitors, DiversiTech has engaged in anticompetitive tortious, and illegal conduct discussed next.

### C. DiversiTech's Anticompetitive, Tortious, and Illegal Conduct

59.    DiversiTech has engaged in a multi-pronged course of conduct designed to unlawfully maintain and protect its monopoly position in plastic HVAC/R pads. This conduct reflects a deliberate strategy to suppress competition, deter market entry, and preserve DiversiTech's dominance without any legitimate procompetitive justification.

### i.    Exclusionary Contracts

60.    DiversiTech has exercised its market power to anticompetitively exclude DuraPlas from the plastic pad market through the use of long-term and not easily terminable, de facto exclusive dealing arrangements structured as conditional rebate programs.

61.    Upon information and belief, under these multi-year arrangements, customers receive substantial rebates of approximately 8% to 12%, but only if they commit to sourcing approximately 80% to 90% of their expected three-year plastic pad demand from DiversiTech.

62.    Upon information and belief, these arrangements may also tie or bundle other product lines or services, further increasing the distributors' cost of switching and reinforcing DiversiTech's dominance across adjacent markets.

63.    Upon information and belief, DiversiTech has entered into these exclusionary arrangements broadly among distributors. Specifically, DuraPlas understands that most, if not all, major distributors and large-volume purchasers across the United States have entered into these or similarly structured agreements with DiversiTech. As a result, the practical effect of these arrangements is to foreclose well over 40% of the plastic pad market (and, given the required volume commitments and DuraPlas's stalled efforts to contest further share, potentially closer to 80% or 90%). This estimate is based on DuraPlas's knowledge of DiversiTech's major accounts, communications with industry distributors, and analysis of distributor purchasing behavior, all of which indicate widespread adoption of high-volume sourcing thresholds that effectively prevent competitors from gaining meaningful access to customers.

64.    Because of the concentration of distributors and buying groups discussed above, a manufacturer that secures long-term or loyalty-based commitments from even a handful of these key distributors effectively forecloses substantial portions of the market from rival suppliers. These exclusionary arrangements deprive DuraPlas and other smaller competitors and potential competitors of the ability to access efficient and scalable distribution required to make the necessary investments to compete with the incumbent DiversiTech; by so doing, the exclusionary arrangements create a significant structural impediment prohibiting the possibility of shifting meaningful volume to alternative suppliers, including DuraPlas.

65.    The structure of these exclusionary arrangements, coupled with the nature of demand, makes it economically infeasible for DuraPlas or any other competitor to meaningfully compete for the majority of demand.

66.    Distributors are unwilling to jeopardize their rebate eligibility under DiversiTech's de facto exclusive arrangements, which are structured to provide significant financial incentives only if the distributor sources a high percentage (typically 80% to 90%) of its plastic pad requirements from DiversiTech over a multi-year period. Because these rebates are tied to overall purchase volume, even modest shifts in sourcing to an alternative supplier like DuraPlas would cause the distributor to fall below the required threshold, resulting in the forfeiture of substantial accrued or anticipated rebates. This effectively locks distributors into long-term sourcing relationships with DiversiTech and forecloses rival suppliers from accessing a critical mass of demand necessary to effectively compete.

67.    As further discussed below, DiversiTech further disincentivizes distributors from departing from its de facto exclusive arrangements through other commercial or legal threats, such as deprivation of access to other DiversiTech products, as well as allegations of patent infringement and implied indemnification exposure. These threats impose not only legal risk but also significant administrative and financial burdens on distributors, further deterring them from engaging with DuraPlas or other competitors. DiversiTech's pattern of intimidation reinforces the practical exclusivity of its arrangements and multiplies the chilling effect on market entry and competition.

68.    Taken together, this conduct reflects an unlawful effort to maintain monopoly power not through superior products or efficiency, but by foreclosing rivals from access to critical distribution and customer relationships.

ii.    **DiversiTech's Improper Leveraging and Acquisition of Intellectual Property**

69.    DiversiTech has also attempted to anticompetitively exclude DuraPlas from the plastic pad market through the threatened assertion of fraudulently obtained patents.

a.    **Prior Art**

70.    As discussed above, one of the competitors whose equipment pad business DiversiTech acquired was NDS. Upon information and belief, NDS manufactured, offered for sale, and sold a line of plastic pad products under the name "Hef-T-Pad" at least as early as June 2002, as indicated by the date affixed to an NDS Equipment Pad Catalog ("EPC") attached hereto as Exhibit A.

71.    The Hef-T-Pad product line offered plastic HVAC/R pads, with each pad including a flat deck, a sidewall, and a set of ribs that extend from the deck and are enclosed by the sidewall. The set of ribs includes several distributed hubs that each have sets of walls extending outwardly therefrom and another set of walls extending inwardly, the second set of walls being shorter in height than the first.

## HEFCO HEF-T-PAD™ BY ⊕NDS

## HEF-T-PADS

The illustrations below demonstrate three of the many applications for the Hef-T-Pad equipment pad.

The Hef-T-Pad is injection molded from high impact polyolefin with UV inhibitors making it easy to handle, yet durable and strong. It does not require any additional equipment for moving and handling. It is resistant to impact, ultra violet degradation and weathering and will not crack, flake or warp. The Hef-T-Pad is virtually impervious to climatic variations. It is drillable to permit installation of refrigerant and electrical lines under and through the pad and to allow equipment to be easily secured to the pad. The Hef-T-Pad features a unique non-creep surface which allows it to absorb vibration, noise and keep the equipment in its original position.



**Hef-T-Pad with Diaphragm Tank**

**Hef-T-Pad with A/C Unit**

**Hef-T-Pad with Pool Pump & Filter**

**Underside of Hef-T-Pad showing support ribs, stabilization pads and stabilization flange.**

## 2" HEF-T-PADS
Product Class 40PD

| Part No. | Description | Color | Pkg. Qty. | Wt. Ea. (lbs.) | List Price (ea.) |
|---|---|---|---|---|---|
| X2424211 | 24"x24"x2" One Piece | Gray | 24 | 6.60 | 15.05 |
| X2430211 | 24"x30"x2" One Piece | Gray | 24 | 8.39 | 19.50 |
| X2436211 | 24"x36"x2" One Piece | Gray | 24 | 10.00 | 23.99 |
| X2442201 | 24"x42"x2" Modular | Gray | 24 | 13.46 | 28.50 |
| X2448201 | 24"x48"x2" Modular | Gray | 24 | 15.58 | 33.05 |
| X2454201 | 24"x54"x2" Modular | Gray | 24 | 17.70 | 37.75 |
| X2460201 | 24"x60"x2" Modular | Gray | 24 | 19.82 | 42.45 |
| X3232211 | 32"x32"x2" One Piece | Gray | 24 | 10.90 | 24.60 |
| X3244211 | 32"x44"x2" One Piece | Gray | 24 | 13.85 | 32.15 |
| X3830211 | 38"x30"x2" One Piece | Gray | 24 | 13.65 | 25.99 |
| X3836211 | 38"x36"x2" One Piece | Gray | 24 | 13.60 | 33.10 |
| X3842211 | 38"x42"x2" One Piece | Gray | 24 | 17.26 | 40.30 |
| X3848201 | 38"x48"x2" Modular | Gray | 24 | 27.97 | 48.05 |
| X3854201 | 38"x54"x2" Modular | Gray | 24 | 32.60 | 54.60 |
| X3860201 | 38"x60"x2" Modular | Gray | 24 | 37.23 | 61.65 |

## 3" HEF-T-PADS
Product Class 40PD

| Part No. | Description | Color | Pkg. Qty. | Wt. Ea. (lbs.) | List Price (ea.) |
|---|---|---|---|---|---|
| X2424311 | 24"x24"x3" One Piece | Gray | 16 | 9.40 | 18.45 |
| X2430301 | 24"x30"x3" Modular | Gray | 16 | 23.74 | 24.05 |
| X2436311 | 24"x36"x3" One Piece | Gray | 16 | 12.00 | 29.50 |
| X2442301 | 24"x42"x3" Modular | Gray | 16 | 13.46 | 34.70 |
| X2448301 | 24"x48"x3" Modular | Gray | 16 | 28.56 | 40.30 |
| X2454301 | 24"x54"x3" Modular | Gray | 16 | 30.97 | 46.10 |
| X2460301 | 24"x60"x3" Modular | Gray | 16 | 33.37 | 51.60 |
| X3030311 | 30"x30"x3" One Piece | Gray | 16 | 13.40 | 24.45 |
| X3232311 | 32"x32"x3" One Piece | Gray | 16 | 15.60 | 27.95 |
| X3238311 | 32"x38"x3" One Piece | Gray | 16 | 15.37 | 36.05 |
| X3244311 | 32"x44"x3" One Piece | Gray | 16 | 13.91 | 39.30 |
| X3636311 | 36"x36"x3" One Piece | Gray | 16 | 16.80 | 38.95 |
| X3848311 | 38"x48"x3" One Piece | Gray | 16 | 23.60 | 49.75 |
| X5065301 | 50"x65"x3" Modular | Gray | 16 | 42.10 | 88.99 |
| X6255301 | 62"x55"x3" Modular | Gray | 16 | 56.92 | 121.70 |
| X7455301 | 74"x55"x3" Modular | Gray | 16 | 71.74 | 153.99 |
| X8655301 | 86"x55"x3" Modular | Gray | 16 | 86.56 | 186.45 |
| X2600311 | 26" Diameter Round One Piece | Gray | 16 | 3.50 | 17.75 |
| X3600311 | 36" Diameter Round One Piece | Gray | 16 | 16.60 | 36.95 |

Ex. A at 2.



The Hef-T-Pad product line as depicted and described above is referred to herein as "the Hef-T-Pad Prior Art."

72.    On or before February 1, 2009, DiversiTech acquired the Hef-T-Pad product line and related equipment support products from NDS. Ex. B. Upon information and belief, DiversiTech thereafter continued to sell the Hef-T-Pad line of products after acquiring the line but subsequently replaced the Hef-T-Pad line with its E-Lite line of products. For example, certain third-party resellers continue to list versions of the Hef-T-Pad sold by DiversiTech on their websites, typically with a note indicating that the relevant pad has been replaced by a DiversiTech E-Lite pad of similar size:



*Hef-T-Pad™ 36 in. x 36 in. x 2 in. Plastic Equipment Pad - Grey*, Ferguson.com (last accessed

May 26, 2025), https://www.ferguson.com/product/diversitech-hef-t-pad-36-in.-x-36-in.-x-2-in.-

plastic-equipment-pad---grey-divx3636211/4392901.html. The "View Product" link adjacent to the notification that the Hef-T-Pad product has been replaced directs to a page for the DiversiTech E-Lite 36 in. x. 36 in. x 2 in. pad. *E Lite® 36 in. x 36 in. x 2 in. Plastic Equipment Pad - Grey*, Ferguson.com (last accessed May 26, 2025), https://www.ferguson.com/product/diversitech-e-lite-36-in.-x-36-in.-x-2-in.-plastic-equipment-pad---grey-divel36362/504078.html.



*Diversitech X3636311, 36 x 36 x 3", Hef-T-Pad™ Plastic Equipment Pad*, LennoxPros.com (last accessed May 26, 2025), https://www.lennoxpros.com/hef-t-pad-plastic-equipment-pad-36-x-36-

x-3-in/p/13N84?clear=true. The product number link adjacent to the notification that a replacement for the Hef-T-Pad product is available directs to a page for the DiversiTech E-Lite 36 in. x. 36 in. x 3 in. pad. *DiversiTech EL3636-3, 36 x 36 x 3", E Lite® Plastic Equipment Pad*, LennoxPros.com (last accessed May 26, 2025), https://www.lennoxpros.com/e-lite-plastic-equipment-pad-36-x-36-x-3-in/p/70X50.

73.    DiversiTech was therefore clearly aware of the Hef-T-Pad Prior Art by at least February 2009 when it acquired the Hef-T-Pad line of products, including the Hef-T-Pad Prior Art, and began to offer those same products for sale.

74.    In early 2022, DuraPlas entered the market for plastic HVAC/R pads when it began to make, sell, and offer for sale its PolarPad line of products, which directly compete with DiversiTech's plastic HVAC/R pads. Although they incorporate additional ribs in its set of ribs that extend from the deck and are enclosed by the sidewall in order to provide a predictable increase in strength and durability, the PolarPad products are substantially similar in structure and function to the Hef-T-Pad Prior Art, particularly to the extent that they both incorporate predominantly rectilinear ribs coupled with a set of circular hubs positioned in different quadrants of the pad, as shown below:

| Hef-T-Pad | DuraPlas PolarPad |
|---|---|



The PolarPad products therefore practice the Hef-T-Pad Prior Art and provide an important alternative to DiversiTech's remaining lines of pads even after DiversiTech discontinued the Hef-T-Pad line.

75.     In contrast to the Hef-T-Pad and PolarPad, DiversiTech's original plastic pad products incorporated a different structure, specifically incorporating a series of arc-shaped concentric ribs centered around the center point of the pad. An exemplary DiversiTech pad from its E-Lite line of products is shown below:

**DiversiTech E-Lite Pad[1]**



76.     This focus on arc-shaped and/or concentric ribs rather than primarily linear ribs is reflected in DiversiTech's patent filings. For example, the January 31, 2025 patent disclosure on DiversiTech's website lists U.S. Patent No. 9,016,653 ("the '653 Patent") and 11,794,440 ("the '440 Patent") as the patents covering DiversiTech's E-Lite line of products. Ex. C, available at https://www.diversitech.com/resources/patents. Both the '653 Patent, which issued on April 28, 2015 and claims priority to a provisional patent application filed on May 3, 2012 (*i.e.*, years before DuraPlas entered the market), and the '440 Patent, which issued on October 24, 2023 from an application filed on May 1, 2013, are expressly entitled "Molded equipment pad ***with arc-shaped ribs***" and contain claims that are limited to pads having "a series of concentric reinforcing arc-shaped ribs attached to the bottom surface of the top deck" or at least several "series of reinforcing

---

[1] *E Lite® EL 40inx40inx3in Plastic Equipment Pad*, DiversiTech.com (last accessed May 26, 2025), https://www.diversitech.com/e-lite-pad-40x40x3.

concentric arc-shaped ribs." Ex. D at 1 (emphasis added), Claims 1-13; Ex. E at 1 (emphasis added), Claims 1-6.

77.    In fact, neither the '653 Patent nor the '440 Patent discloses any embodiments that lack arc-shaped ribs or concentric ribs, as reflected in their shared figures depicting the claimed inventions:



*E.g.,* Ex. D at Figs. 2, 4, 9, 11; *see also* Figs. 15-24 (depicting alternative embodiments that all have arc-shaped ribs, concentric ribs, or both).

**b.    DiversiTech's Fraudulent Patent Assertions against DuraPlas**

78.    Shortly after DuraPlas entered the market for plastic HVAC/R pads, DiversiTech implemented a campaign aimed at forcing DuraPlas out of the market by improperly accusing DuraPlas's PolarPad products of infringing a family of DiversiTech patents that it is impossible for PolarPad products to infringe. The DuraPlas products at issue indisputably do not disclose each

and every limitation of any valid claim of the patents. Notably, at least two of the patents are invalid and unenforceable because they were improperly and fraudulently obtained.

79.     DiversiTech personnel and executives verbally accused DuraPlas's PolarPad line of plastic HVAC/R pad products of infringing DiversiTech's "patents," including specifically the patents covering DiversiTech's E-Lite line of products, both directly in conversations with DuraPlas personnel and through communications with certain of DuraPlas's customers.

80.     Upon information and belief, beginning no later than December 2023, DiversiTech representatives began to contact DuraPlas customers and tell them that DuraPlas's PolarPad products faced unidentified "issues" with DiversiTech's patents. These allegations persisted for over a year, with multiple customers and industry contacts reporting to DuraPlas that DiversiTech representatives and executives had accused its PolarPad products of infringing DiversiTech patents, including specifically the patents covering DiversiTech's E-Lite line of plastic HVAC/R pad products.

81.     After more than a year of accusations from DiversiTech, made both directly to DuraPlas and generally in the market, DiversiTech asked DuraPlas to meet in April 2025. DiversiTech framed the meeting as an IP discussion and during the meeting, it was confirmed that there was indeed a patent issue. After DuraPlas indicated that it did not believe it infringed any DiversiTech patents and was not interested in licensing any DiversiTech patents, DiversiTech indicated that DuraPlas should expect to receive a letter from DiversiTech.

82.     DuraPlas never received a letter from DiversiTech. Instead, following the April 2025 meeting, DiversiTech continued its campaign to instill fear, uncertainty, and doubt regarding DuraPlas's PolarPad products among DuraPlas's customers and within the plastic HVAC/R pad market as a whole. For example, as discussed herein, upon information and belief, DiversiTech

Chief Executive Officer Andy Bergdoll contacted multiple DuraPlas customers to inform them of the meeting between DuraPlas and DiversiTech and even told the general manager of one customer that DuraPlas was infringing DiversiTech's patents. So that the threat landed with the intended effect, Mr. Bergdoll referenced a potential need to indemnify that same customer, suggesting to the customer that it had reason to fear being sued for infringement itself. Another DuraPlas customer informed DuraPlas around the same time that DiversiTech representative Mark Harris had approached its personnel and stated (falsely) that the PolarPad was already in litigation.

83.    In addition to direct customers, social media influencers engaged to promote videos about DuraPlas's PolarPad also informed DuraPlas that they had been contacted and notified that DiversiTech accused the PolarPad of infringing DiversiTech patents, including at least one influencer who indicated that the PolarPad was accused specifically of infringing the DiversiTech patents that cover the E-Lite line.

84.    Upon information and belief, the only patents assigned to and owned by DiversiTech that relate to the E-Lite line of products specifically or plastic HVAC/R pad products generally are a single patent family, currently made up of four patents that have or will soon issue: the '653 Patent, the '440 Patent, U.S. Patent No. 12,312,123 ("the '123 Patent"), and U.S. Patent No. 12,319,468 ("the '468 Patent") (collectively, "the Challenged Patents"). This understanding is consistent with the January 31, 2025 patent disclosure on DiversiTech's website, which lists the '653 Patent and the '440 Patent as the patents that DiversiTech contends cover the E-Lite line of products, *i.e.*, the patents that DuraPlas is informed and believes DiversiTech has accused DuraPlas's PolarPad products of infringing. Ex. C, available at https://www.diversitech.com/resources/patents. Accordingly, DuraPlas reasonably understands

the Challenged Patents, including the now issued '123 Patent and the soon-to-be-issued '468 Patent, to constitute the patents that DiversiTech accuses the PolarPad products of infringing.[2]

85.    Based on the recorded patent file history of the United States Patent and Trademark Office ("USPTO"), DiversiTech is the assignee and owner of the '653 Patent. The '653 Patent, which is entitled "Molded equipment pad with arc-shaped ribs," was issued by the USPTO on April 28, 2015 and was originally filed on May 1, 2013 as U.S. Patent Application No. 13/874,727 ("the '727 Application"), which claims priority to Provisional Patent Application No. 61/641,937 filed on May 3, 2012. A true and correct copy of the '653 Patent is attached hereto as Exhibit D. DiversiTech's filing of the '727 Application predates DuraPlas's entry into the market with its PolarPad products.

86.    Based on the recorded patent file history of the USPTO, DiversiTech is the assignee and owner of the '440 Patent. The '440 Patent, entitled "Molded equipment pad with arc-shaped ribs," was issued by the USPTO on October 24, 2023 and was originally filed on May 1, 2013 as U.S. Patent Application No. 13/874,793 ("the '793 Application"), which is a continuation of the '727 Application. A true and correct copy of the '440 Patent is attached hereto as Exhibit E. DiversiTech's filing of the '793 Application also predates DuraPlas's entry into the market with its PolarPad products.

87.    Based on the recorded patent file history of the USPTO, DiversiTech is the assignee and owner of the '123 Patent. The '123 Patent, entitled "Molded equipment pad with arc-shaped ribs," was issued by the USPTO at 12:01 a.m. ET on May 27, 2025 (11:01 p.m. CT on May 26,

---

[2] As of January 31, 2025, the date of the patent disclosure, the '653 Patent and the '440 Patent were the only Challenged Patents that had issued. As discussed in further detail herein, the '123 Patent and '468 Patent arise from applications that are related and claim priority to the '653 Patent and the '440 Patent.

2025) and was originally filed on May 24, 2024 as U.S. Patent Application No. 18/674,037 ("the

'037 Application"), which is a continuation of U.S. Patent Application No. 18/214,933 ("the '933

Application"), which is in turn a continuation of the '793 Application, which is in turn a

continuation of the '727 Application. A true and correct copy of the issue notification, notice of

allowance, and allowed claims for the '123 Patent is attached hereto as Exhibit F.

88.     Based on the recorded patent file history of the USPTO, DiversiTech is the assignee

and owner of the '468 Patent. The '468 Patent, entitled "Molded equipment pad with arc-shaped

ribs," is scheduled to be issued by the USPTO on June 3, 2025 and was originally filed on June

27, 2023 as the '933 Application, which is a continuation of the '793 Application, which is in turn

a continuation of the '727 Application. A true and correct copy of the issue notification for the

'468 Patent is attached hereto as Exhibit G, and a true and correct copy of the allowed claims of

the '468 Patent that are expected to issue on June 3, 2025 is attached hereto as Exhibit H.

89.     Notably, DiversiTech filed the '933 Application just months after DuraPlas entered

the market with its PolarPad products, with the '793 Application being filed shortly thereafter.

Unlike the applications that led to the earlier '653 Patent and '440 Patent, DiversiTech also filed

Track One Requests for both applications in an effort to receive prioritized examination at the

USPTO. Although DiversiTech's request was denied with respect to the '933 Application, the '037

Application was granted Track One status and issued as the '123 Patent just over one year after

the application was filed.

90.     The claims of the '123 Patent and the '468 Patent represent a significant departure

from the structure described in the Challenged Patents' shared specification and claimed by

DiversiTech over the course of more than 10 years in the '653 Patent and '440 Patent. Upon

information and belief, DiversiTech diverted from its decade-long strategy and directed the

drafting of the claims of the '123 Patent and the '468 Patent specifically to target and encompass the features of the DuraPlas PolarPad products, with the ultimately objective of forcing DuraPlas out of the plastic HVAC/R pad market or, at a minimum, limiting DuraPlas's ability to compete in the plastic HVAC/R pad market.

91.     The Challenged Patents share a common specification directed to equipment pads with "a series of arc-shaped ribs that are centered on the center of the equipment pad" and does not disclose any embodiments that lack concentric arc-shaped ribs. Ex. D at Abstract. Consistent with the scope of the specification, all claims of the '653 Patent and the '440 Patent specifically require at least one series of concentric arc-shaped ribs. This is consistent with these patents' being directed to DiversiTech's E-Lite line of plastic pads as those products also have a series of arc-shaped ribs centered on the center of the equipment pad comparable to those shown in the figures of the '653 Patent and the '440 Patent.

| '653 Patent / '440 Patent Figure 9 | DiversiTech E-Lite Pad[3] |
| --- | --- |
|  | |

---

[3] *E Lite® EL 40inx40inx3in Plastic Equipment Pad*, DiversiTech.com (last accessed May 26, 2025), https://www.diversitech.com/e-lite-pad-40x40x3.

92.    DuraPlas's PolarPad products lack concentric arc-shaped ribs. Instead, the ribs of the PolarPad products either are rectilinear or, with respect to the four circular hubs, are not concentric with one another or any other structure.



**DuraPlas PolarPad[4]**

Accordingly, DuraPlas's PolarPad products do not practice the claims of the '653 Patent or the '440 Patent.

93.    Despite the fact that the shared specification of the Challenged Patents is directed solely to equipment pads having arc-shaped ribs, the claims of the '123 Patent and the '468 Patent – the two patents that issued from applications DiversiTech filed after DuraPlas entered the market – do not require arc-shaped ribs. *E.g.,* Ex. F at Claims 1-2; Ex. H. Upon information and belief, this broadened claim scope represents an (unsuccessful and unlawful) attempt by DiversiTech to target and capture DuraPlas's PolarPad products within the claims of the Challenged Patents and,

---

[4]PolarPad, DuraPlas (last accessed May 26, 2025), https://duraplasinc.com/en/hvac/polar-pad.

by extension, to limit or eliminate DuraPlas's ability to compete in the plastic HVAC/R pad market by leveraging DiversiTech's alleged patent rights.

94.    By attempting (but failing) to capture DuraPlas's PolarPad products, the claims of the '123 Patent and the '468 Patent also capture and ensnare the prior art, including by way of example, the Hef-T-Pad Prior Art. This renders the '123 Patent invalid as anticipated and/or obvious, and once the '468 Patent issues, will also render those claims invalid as each and every element of the claims are disclosed in the prior art.

95.    Furthermore, DuraPlas is informed and believes that one or more of DiversiTech and its patent prosecution counsel, including at least DiversiTech's Chief Strategy Officer Nicole Kroner and the individual attorney(s) who prepared and signed documents submitted during prosecution of the '123 Patent and the '468 Patent, knowingly and willfully failed to disclose known material prior art in the form of at least the Hef-T-Pad Prior Art to the USPTO in violation of their duty of candor and good faith in dealing with the USPTO, which includes a duty to disclose to the USPTO all information known to that individual to be material to patentability.

96.    The '037 Application, filed on May 24, 2024, was accompanied by a Power of Attorney (Ex. I) signed by Ms. Kroner on behalf of DiversiTech and an Information Disclosure Statement (Ex. J) signed by patent prosecution counsel identifying several patents and patent applications, as well as two non-patent references. The IDS did not, however, disclose DiversiTech's own Hef-T-Pad Prior Art in the IDS.

97.    After several rejections of and amendments to the claims, the claims of the '037 Application were allowed on February 26, 2025, and the '037 Application issued as the '123 Patent on May 27, 2025 (Ex. K; Ex. F).

98.     DiversiTech, through one or more of Ms. Kroner and its patent prosecution counsel, did not at any time during prosecution of the '037 Application disclose the Hef-T-Pad Prior Art to the USPTO, nor was the Hef-T-Pad Prior Art disclosed to the USPTO during the prosecution of any of the '037 Application's parent applications. The Hef-T-Pad Prior Art is not part of the file history of the '123 Patent or listed on the face of the '123 Patent, and as such, the Examiner did not consider the Hef-T-Pad Prior Art.

99.     The Hef-T-Pad Prior Art was material to a reasonable examiner in deciding whether to allow the claims of the '037 Application because, among other things, the Hef-T-Pad Prior Art discloses each and every element of at least Claims 1 and 2 of the '123 Patent, which issued from the '037 Application.

100.     DiversiTech, through Ms. Kroner and its patent prosecution counsel had knowledge of the withheld Hef-T-Pad references during prosecution of the '037 Application. Indeed, there can be no doubt about DiversiTech's knowledge of the Hef-T-Pad Prior Art and its need to disclose such prior art to the USPTO as DiversiTech had acquired the Hef-T-Pad line in 2009 and had sold and offered for sale the Hef-T-Pad Prior Art.[5]

101.     The failure by DiversiTech, Ms. Kroner, and its patent prosecution counsel to disclose to the USPTO references of which one or more of were aware and knew were material was intended to deceive the USPTO. The '123 Patent would not have issued had the Hef-T-Pad Prior Art been disclosed.

---

[5] *DiversiTech Acquires the Hef-T-Pad Product Line*, Contracting Business (Feb. 1, 2009), https://www.contractingbusiness.com/hvacrdb/article/20858399/diversitech-acquires-the-hef-t-pad-product-line; DiversiTech Technical Data Sheet Hef-T-Pad[TM] (last accessed May 26, 2025), http://media.diversitech.com/doc/DOC33029.pdf.

102.     DiversiTech's threatened assertion of a patent it fraudulently obtained from the USPTO constitutes a deliberate, anticompetitive, exclusionary, predatory, tortious, and illegal tactic to suppress competition in the relevant market. If successful, this threat would effectively exclude DuraPlas from participating in the plastic pad market, not through superior products or innovation, but through the enforcement of invalid intellectual property rights. The result would be the elimination of one of the few viable competitive alternatives to DiversiTech, thereby unlawfully preserving DiversiTech's monopoly power.

### iii.     Threats and Insinuations to Potential Customers

103.     In order to bolster the effectiveness of the above-mentioned anticompetitive, tortious, and illegal conduct, DiversiTech has persisted in making threatening and disparaging statements to DuraPlas's potential customers.

104.     These threats and insinuations began as early as late 2022 or early 2023, shortly after DuraPlas's entry into the market. For example, upon information and belief, DiversiTech arranged for meetings with at least one prospective distributor in discussions with DuraPlas, insinuating there would be "repercussions" restricting the "overall access to all DiversiTech products."

105.     DuraPlas has also been informed in 2023 by at least one other prospective distributor that because PolarPad was a "stellar" product being provided at a "very reasonable price," it would, "in a vacuum," normally be "all in." However, that distributor, in very guarded terms, informed DuraPlas that given the "intricacies of" its "other suppliers relationships" it was "not a good time" for them to "make any supplier changes." Based on DuraPlas's knowledge of the prospective distributor's business and the tenor of that conversation, DuraPlas understood that prospective distributor to be referring to DiversiTech. Upon information and belief, DiversiTech

has continued to have similar conversations with other prospective distributors throughout 2024 and 2025.

106.    Upon information and belief, DiversiTech has also, since at least late 2022 or early 2023, informed distributors and buyers that there is no commercial reason to engage with DuraPlas, as DiversiTech intends to acquire DuraPlas's business or eliminate it from the market. For example, in addition to DiversiTech's statements to DuraPlas distributors following the April 2025 meeting, DuraPlas employees were informed by attendees of a 2023 industry conference that DiversiTech had told industry members that DuraPlas's PolarPad products have an "issue" regarding "patents."

107.    These statements are calculated to chill demand, undermine customer confidence, and interfere with DuraPlas's business relationships, and they reflect an effort by DiversiTech to exclude competition through coercive, tortious, and anticompetitive means rather than on the merits.

### iv.    DiversiTech's Anticompetitive and Tortious Intent

108.    DiversiTech's intent to suppress competition and protect its monopoly position is evident from the nature and pattern of its conduct, including de facto exclusionary arrangements, the prosecution and threatened assertion of fraudulently obtained patents, and threats or insinuations directed at customers

109.    The cumulative effect of the specific actions discussed in detail above reflects a deliberate strategy to block a legitimate entrant not through superior quality, innovation, or pricing, but through coercive, tortious, and unlawful means.

110.    Upon information and belief, DiversiTech is well aware of its dominant market position, the significant competitive threat that DuraPlas poses to its business, and the absence of

other rivals (due to DiversiTech's own conduct) that present a comparable challenge. Accordingly, DiversiTech's actions were not accidental or incidental, but calculated and deliberate responses to that threat. The timing, coordination, and nature of DiversiTech's conduct demonstrate a clear intent not to compete on the merits, but to preserve its monopoly by obstructing DuraPlas's entry and suppressing its growth through unlawful and exclusionary means.

### v.    Harm to DuraPlas, Competition, and Consumers from DiversiTech's Conduct

111.    DiversiTech's conduct has caused substantial harm to competition by first extinguishing market rivals through a string of acquisitions and then preventing a willing and capable competitor from entering and participating in the market on equal terms. By deploying fraudulent patents, exclusionary arrangements, and coercive communications with customers, DiversiTech has raised artificial barriers to entry and protected its monopoly position not through innovation or efficiency, but through unlawful tactics. This suppression of all legitimate rivals has reduced the pressure on DiversiTech to lower prices, improve product quality, or expand service options—core benefits that competition is meant to deliver.

112.    DuraPlas estimates that, as a direct and proximate result of DiversiTech's anticompetitive, tortious, and unlawful conduct, it and previous competitors that have since been acquired by DiversiTech have been foreclosed from accessing millions of dollars of sales opportunities. In addition to these lost sales, DiversiTech's conduct has caused DuraPlas to suffer reputational harm, diminished goodwill, lost business relationships, and other consequential damages that continue to adversely impact DuraPlas's competitive standing in the market.

113.    The harm extends beyond DuraPlas to the broader market, including harm to distributors and end customers. When a dominant firm uses illegal means to block competition, customers are denied the ability to choose from alternative suppliers that may offer better terms or

products. In this case, buyers of HVAC/R pads—including distributors and end customers—have already been deprived of the price discipline and product innovation that would have resulted from DuraPlas's full and fair market participation along with the full and fair market participation of all the competitors that DiversiTech acquired over the years. Instead, customers face a marketplace distorted by fear, misinformation, and restricted access, leading to higher prices, reduced selection, and stunted progress.

114.    The harm to customers is not only ongoing but will likely intensify if DiversiTech's conduct remains unchecked. In the absence of meaningful competition from rivals such as DuraPlas, distributors and end customers will continue to face inflated prices, limited product options, and reduced service responsiveness. DiversiTech will have no market-based incentive to lower prices, improve quality, or innovate. Distributors and end customers will remain locked into a constrained and manipulated supply chain, where purchasing decisions are dictated not by merit or value, but by contractual coercion and fear of retaliation. The long-term effect will be a stagnant market characterized by reduced efficiency, higher costs, and diminished customer welfare— precisely the type of consumer harm the antitrust laws are intended to prevent.

115.    This conduct further chills future entry and expansion. Other potential competitors observing DiversiTech's tactics may reasonably conclude that entering the market invites legal harassment, customer intimidation, or retaliatory exclusion—not genuine competition. The long-term effect is to entrench monopoly power and deter the kind of dynamic rivalry that the antitrust laws seek to preserve. Without intervention, the market remains locked in a stagnant and anticompetitive state, to the detriment of all but DiversiTech.

116.    DiversiTech's selective pricing behavior underscores the broader competitive harm. For years, DiversiTech maintained high list prices supported by exclusive or loyalty-based

agreements that locked up as much as 90% of customer demand through volume-based rebate programs.

117.     Upon information and belief, only after DuraPlas began to enter the market did DiversiTech offer lower list prices. But even then, it did so not through open, merit-based competition, but by conditioning those lower prices and rebates on continued exclusivity, ensuring that customers remained effectively locked in to purchasing their plastic pads from DiversiTech. These tactics were not intended to deliver lasting benefits to customers, but to neutralize DuraPlas's entry and preserve DiversiTech's dominance.

118.     If true competition were allowed to take hold, DuraPlas's ongoing presence would exert further downward pressure on prices and improve customer choice. Instead, DiversiTech's exclusionary tactics have ensured that any price "relief" is partial and temporary and conditioned on de facto exclusivity, reinforcing its monopoly power and depriving customers of the sustained pricing, quality, and innovation advantages that a competitive market would otherwise provide.

119.     DiversiTech cannot justify this substantial harm to competition by pointing to claimed efficiencies, procompetitive benefits, or legitimate business justifications—particularly where those same outcomes could be achieved through less restrictive and non-exclusionary means.

## COUNT I – MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

120.     DuraPlas repeats and realleges every allegation contained in the foregoing paragraphs as if set forth fully herein.

121.     The relevant market is the market for plastic HVAC/R pads in the United States.

122.     At least since 2022, DiversiTech has had monopoly power in the United States with respect to plastic HVAC/R pads. This power is evidenced by Defendant's dominant market share

of up to 80% to 90%, its ability to control prices and exclude competition, and the high barriers to entry resulting from its exclusionary practices.

123.    DiversiTech has willfully acquired and maintained its monopoly power through a sustained course of anticompetitive conduct, including but not limited to the following:

   a.    Engaging in long-term conditional rebate programs and other loyalty-based agreements with major distributors and high-volume customers that effectively operate as de facto exclusive dealing arrangements foreclosing a substantial portion of the market, impair the ability of DuraPlas and other rivals from competing effectively, and tend to maintain or enhance DiversiTech's monopoly power by suppressing competition rather than by improving products, pricing, or service;

   b.    Threatening to enforce patents knowingly and willfully procured through fraud on the USPTO by intentionally withholding material prior art and making misleading statements during prosecution, and which patents would not have issued but for the fraudulent conduct;

   c.    Reinforcing and enhancing the effectiveness of the above exclusionary practices through threats and false claims made to distributors and end customers attempting to deal with DuraPlas, including baseless allegations of legal exposure, loss of rebates and access to products, or patent infringement.

124.    Rather than compete on the merits through price, quality, or innovation, DiversiTech has engaged in exclusionary tactics designed to suppress competition and entrench its dominance in the plastic pad market.

125.    DiversiTech's conduct lacks any legitimate procompetitive justification. To the extent DiversiTech asserts any efficiencies or business rationales, such outcomes do not outweigh the anticompetitive effects of DiversiTech's conduct and could be achieved through significantly less restrictive means that do not impair competition or harm customers.

126.    DiversiTech has undertaken this conduct in the United States and its business activities and operations involve and affect interstate commerce.

127.    As a direct and proximate result of DiversiTech's exclusionary conduct, DuraPlas has suffered injury to its business and property, DuraPlas and other competitors have been substantially foreclosed from competing in the market, and customers have suffered, and will continue to suffer, harm in the form of higher prices, reduced output, diminished product quality, and suppressed innovation.  DuraPlas's injuries are of the type the antitrust laws are intended to prohibit and flow directly from DiversiTech's anticompetitive conduct in violation of Section 2 of the Sherman Act. The conduct of DiversiTech is continuing and will continue to impose antitrust injury on DuraPlas unless monetary and equitable and injunctive relief are granted.

128.    DiversiTech's anticompetitive acts constitute unlawful monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT II – ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

129.    DuraPlas repeats and realleges every allegation contained in the foregoing paragraphs as if set forth fully herein.

130.    The relevant market is the market for plastic HVAC/R pads in the United States.

131.    DiversiTech has engaged in a course of exclusionary and anticompetitive conduct with the specific intent to acquire monopoly power in the market for plastic HVAC/R pads.

132.    DiversiTech's exclusionary conduct includes but is not limited to:

a. Engaging in long-term conditional rebate programs and other loyalty-based agreements with major distributors and high-volume customers that effectively operate as de facto exclusive dealing arrangements foreclosing a substantial portion of the market, impair the ability of DuraPlas and other rivals from competing effectively, and threatens a dangerous probability of success in achieving monopoly power by suppressing competition rather than by improving products, pricing, or service;

b. Threatening to enforce patents knowingly and willfully procured through fraud on the USPTO by intentionally withholding material prior art and making misleading statements during prosecution, and which patents would not have issued but for the fraudulent conduct;

c. Reinforcing and enhancing the effectiveness of the above exclusionary practices through threats and false claims made to distributors and end customers attempting to deal with DuraPlas, including baseless allegations of legal exposure, loss of rebates and access to products, or patent infringement.

133. DiversiTech's conduct was undertaken with the specific intent to monopolize the plastic pad market by excluding DuraPlas and other potential entrants, suppressing competition, and preserving DiversiTech's dominance through unlawful means rather than by competing on the merits.

134. DiversiTech's exclusionary conduct presents a dangerous probability of success in achieving monopoly power, given its high market share, the substantial foreclosure of key distribution channels, the absence of other significant competitors, and the structural barriers to entry Defendant has imposed through its conduct.

135.     DiversiTech's conduct lacks any legitimate procompetitive justification. To the extent DiversiTech asserts any efficiencies or business rationales, such outcomes do not outweigh the anticompetitive effects of DiversiTech's conduct and could be achieved through significantly less restrictive means that do not impair competition or harm customers.

136.     DiversiTech has undertaken this conduct in the United States and its business activities and operations involve and affect interstate commerce.

137.     As a direct and proximate result of DiversiTech's exclusionary conduct, DuraPlas has suffered injury to its business and property, DuraPlas and other competitors have been substantially foreclosed from competing in the market, and customers have suffered, and will continue to suffer, harm in the form of higher prices, reduced output, diminished product quality, and suppressed innovation. DuraPlas's injuries are of the type the antitrust laws are intended to prohibit and flow directly from DiversiTech's anticompetitive conduct in violation of Section 2 of the Sherman Act.  The conduct of DiversiTech is continuing and will continue to impose antitrust injury on DuraPlas unless equitable and injunctive relief are granted.

138.     DiversiTech's actions constitute attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT III – EXCLUSIONARY CONTRACTS IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT

139.     DuraPlas repeats and realleges every allegation contained in the foregoing paragraphs as if set forth fully herein.

140.     The relevant market is the market for plastic HVAC/R pads in the United States.

141.     DiversiTech has entered into and enforced a series of de facto exclusive dealing arrangements with distributors with respect to the sale of goods, namely plastic HVAC/R pads. These arrangements are structured as long-term, multi-year rebate programs, under which

customers receive substantial financial incentives—typically between 8% and 12%—but only if they commit to sourcing approximately 80% to 90% of their plastic pad requirements from DiversiTech.

142.    Upon information and belief, these arrangements have been implemented across a broad portion of the industry and have the effect of foreclosing well over 40% of the market to rival suppliers, including DuraPlas. This foreclosure is amplified by the high concentration of distribution channels in the industry, such that securing loyalty from even a limited number of key accounts effectively blocks access to large portions of the market.

143.    In addition to these contractual arrangements, DiversiTech has reinforced its exclusivity through coercive communications with customers, including threats of legal exposure and implied consequences for dealing with DuraPlas. These communications have further deterred customers from engaging with alternative suppliers, compounding the exclusionary impact of the underlying rebate programs.

144.    These exclusive dealing practices have substantially lessened competition and tended to create a monopoly in the plastic pad market by raising barriers to entry, excluding efficient competitors, and denying customers the ability to make purchasing decisions based on merit, price, or quality.

145.    DiversiTech has undertaken this conduct in the United States and its business activities and operations involve and affect interstate commerce.

146.    As a direct and proximate result of DiversiTech's exclusionary conduct, DuraPlas has suffered injury to its business and property, DuraPlas and other competitors have been substantially foreclosed from competing in the market. Moreover, as a direct and proximate result of DiversiTech's conduct, competition has been substantially lessened and it has created a

monopoly with respect to plastic HVAC/R pads such that customers have suffered, and will continue to suffer, harm in the form of higher prices, reduced output, diminished product quality, and suppressed innovation. DuraPlas's injuries are of the type the antitrust laws are intended to prohibit and flow directly from DiversiTech's anticompetitive.  The conduct of DiversiTech is continuing and will continue to impose antitrust injury on DuraPlas unless equitable and injunctive relief are granted.

147.     DiversiTech's conduct constitutes unlawful exclusive dealing in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

### COUNT IV – DECLARATORY JUDGEMENT OF INVALIDITY AND UNENFORCEABILITY (U.S. PATENT NO. 12,312,123)

148.     DuraPlas repeats and realleges every allegation contained in the foregoing paragraphs as if set forth fully herein.

149.     Each and every claim of the '123 Patent is invalid for failure to comply with one or more of the requirements of the United States Code, Title 35, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112, and the rules, regulations, and laws pertaining thereto.

150.     For example, the '123 Patent's only independent claims, Claims 1 and 2, are invalid over the Hef-T-Pad Prior Art, as demonstrated in the claim chart attached hereto as Exhibit L, which demonstrates how exemplary teachings of the Hef-T-Pad Prior Art anticipate and/or render obvious each and every limitation of Claims 1 and 2. DuraPlas reserves the right to modify and expand upon its invalidity theories as discovery progresses in this case; it shall not be estopped for invalidity contention purposes by information contained in this Paragraph, including as it relates to the dependent claims of the '123 Patent. This paragraph is intended to satisfy the notice requirements of Federal Rule of Civil Procedure 8(a)(2); it does not represent DuraPlas's preliminary or final invalidity positions.

151.    The '123 Patent is also unenforceable due to inequitable conduct before the USPTO due to DiversiTech's failure to disclose prior art of which it was aware and had been selling since before the priority date of the '123 Patent.[6]

152.    Specifically, DuraPlas is informed and believes that DiversiTech and its patent prosecution counsel, including at least DiversiTech's Chief Strategy Officer Nicole Kroner and the individual attorney(s) who prepared and signed documents submitted during prosecution of the '037 Application, knowingly and willfully failed to disclose known material prior art in the form of at least the Hef-T-Pad Prior Art to the USPTO in violation of their duty of candor and good faith in dealing with the USPTO, which includes a duty to disclose to the USPTO all information known to that individual to be material to patentability.

153.    On May 24, 2024, DiversiTech's patent prosecution counsel filed a patent application, subsequently designated as U.S. Patent Application No. 18/674,037 ("the '037 Application") on behalf of DiversiTech as a continuation of U.S. Patent Application No. 18/214,933 filed on June 27, 2023, which in turn is a continuation of U.S. Patent Application No. 13/874,793 filed on May 1, 2013, which is a continuation of U.S. Patent Application No. 13/874,727 filed on May 1, 2013.

154.    The '037 Application was accompanied by a Power of Attorney (Ex. I) signed by Ms. Kroner on behalf of DiversiTech and an Information Disclosure Statement (Ex. J) signed by DiversiTech's patent prosecution counsel identifying several patents and patent applications, as well as two non-patent references. The IDS did not, however, disclose the Hef-T-Pad Prior Art in the IDS.

---

[6] 37 C.F.R. § 1.56.

155.    After several rejections of and amendments to the claims, the claims of the '037 Application were allowed on February 26, 2025, and the '037 Application issued as the '123 Patent on May 27, 2025 (Ex. K; Ex. F).

156.    DiversiTech, through one or more of Ms. Kroner and its patent prosecution counsel, did not at any time during prosecution of the '037 Application disclose the Hef-T-Pad Prior Art to the USPTO, nor was the Hef-T-Pad Prior Art disclosed to the USPTO prosecution of any of the '037 Application's parent applications. The Hef-T-Pad Prior Art is not a part of the file history of the '123 Patent, is not listed on the face of the '123 Patent, and as such, the Examiner did not consider the Hef-T-Pad Prior Art.

157.    The Hef-T-Pad Prior Art was material to a reasonable examiner in deciding whether to allow the claims of the '037 Application because, among other things, the Hef-T-Pad Prior Art discloses each and every element of at least Claims 1 and 2 of the '123 Patent, which issued from the '037 Application.

158.    DiversiTech, through one or more of Ms. Kroner or its patent prosecution counsel, had knowledge of the withheld Hef-T-Pad references during prosecution of the '037 Application. Indeed, DiversiTech acquired the Hef-T-Pad line in 2009 and had sold and offered for sale the Hef-T-Pad Prior Art.[7]

159.    Failure to disclose to the USPTO references of which one or more of DiversiTech, Ms. Kroner, and its patent prosecution counsel were aware and knew were material and intended to deceive the USPTO.

---

[7] *DiversiTech Acquires the Hef-T-Pad Product Line*, Contracting Business (Feb. 1, 2009), https://www.contractingbusiness.com/hvacrdb/article/20858399/diversitech-acquires-the-hef-t-pad-product-line; *DiversiTech Technical Data Sheet Heft-T-Pad*[TM] (last accessed May 26, 2025), http://media.diversitech.com/doc/DOC33029.pdf.

160.    DiversiTech, Ms. Kroner, and its patent prosecution counsel committed inequitable conduct by failing to disclose the known Hef-T-Pad Prior Art to the USPTO during prosecution of the '037 Application. The '123 Patent would not have issued had the Hef-T-Pad Prior Art been disclosed.

161.    As a result of the conduct of DiversiTech, Ms. Kroner, and its patent prosecution counsel, the '123 Patent is unenforceable.

162.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DuraPlas is entitled to judgment from this Court finding that the '123 Patent is invalid pursuant to 35 U.S.C. §§ 101, 102, 103 and/or 112 and unenforceable for inequitable conduct.

### COUNT V – DECLARATORY JUDGMENT OF NONINFRINGEMENT
### (U.S. PATENT NO. 12,312,123)

163.    DuraPlas repeats and realleges every allegation contained in the foregoing paragraphs as if set forth fully herein.

164.    DuraPlas does not and has not in the past made, used, sold, offered for sale, or imported any products that infringe any valid claim of the '123 Patent, either directly or indirectly, and DuraPlas does not and has not in the past infringed, contributed to the infringement of, or induced infringement of any valid claim of the '123 Patent either literally or under the doctrine of equivalents.

165.    For example, DuraPlas's PolarPad products, which were the subject of DiversiTech's allegations of infringement as expressed directly to DuraPlas and indirectly via allegations made to certain DuraPlas customers, cannot infringe any valid claim of the '123 Patent because the PolarPad products merely practice the prior art, including the Hef-T-Pad Prior Art. DuraPlas reserves the right to modify and expand upon its noninfringement theories as discovery progresses in this case; it shall not be estopped for noninfringement purposes by information

contained in this paragraph. This Paragraph is intended to satisfy the notice requirements of Federal Rule of Civil Procedure 8(a)(2); it does not represent DuraPlas's preliminary or final noninfringement positions.

166.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DuraPlas is entitled to judgment from this Court finding that DuraPlas does not infringe the '123 Patent pursuant to 35 U.S.C. § 271.

### COUNT VI – DECLARATORY JUDGEMENT OF NONINFRINGEMENT (U.S. PATENT NO. 11,794,440)

167.    DuraPlas repeats and realleges every allegation contained in the foregoing paragraphs as if set forth fully herein.

168.    DuraPlas does not and has not in the past made, used, sold, offered for sale, or imported any products that infringe any valid claim of the '440 Patent, either directly or indirectly, and DuraPlas does not and has not in the past infringed, contributed to the infringement of, or induced infringement of any valid claim of the '440 Patent either literally or under the doctrine of equivalents.

169.    For example, DuraPlas's PolarPad products, which were the subject of DiversiTech's allegations of infringement as expressed directly to DuraPlas and indirectly via allegations made to certain DuraPlas customers, do not comprise each and every element of the claims of the '440 Patent least because DuraPlas's PolarPad products do not disclose a "series of reinforcing concentric arc-shaped ribs," let alone four such series as required by the sole independent claim of the '440 Patent. Ex. E at Claim 1.

170.    The '440 Patent discloses that "the network 130 of reinforcing ribs is attached to the bottom surface 116 of the deck 112 and occupies the space between the side walls 122. . . . The

network 130 of reinforcing ribs also includes segments of a series of concentric arc-shaped ribs 136 that are centered on the center point 118," as shown in Figure 11 below:



FIG. 11

Ex. E at 7:5-14; Fig. 11.

171.    In comparison, DuraPlas's PolarPad products do not comprise any concentric arc-shaped ribs that are centered on the center point of a top deck. Instead, the ribs of the PolarPad products either are all rectilinear or, with respect to the four circular hubs, are not concentric.



DuraPlas's PolarPad products therefore cannot literally infringe any claims of the '440 Patent.

172. DuraPlas's PolarPad products also cannot infringe any valid claim of the '440 Patent literally or under the doctrine of equivalents because the PolarPad products merely practice the prior art, including the Hef-T-Pad Prior Art.

173. DuraPlas reserves the right to modify and expand upon its noninfringement theories as discovery progresses in this case; it shall not be estopped for noninfringement purposes by information contained in the foregoing paragraphs. The foregoing paragraphs are intended to satisfy the notice requirements of Federal Rule of Civil Procedure 8(a)(2); it does not represent DuraPlas's preliminary or final noninfringement positions.

174. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DuraPlas is entitled to judgment from this Court finding that DuraPlas does not infringe the '440 Patent pursuant to 35 U.S.C. § 271.

### COUNT VII – DECLARATORY JUDGEMENT OF NONINFRINGEMENT
### (U.S. PATENT NO. 9,016,653)

175. DuraPlas repeats and realleges every allegation contained in the foregoing paragraphs as if set forth fully herein.

176. DuraPlas does not and has not in the past made, used, sold, offered for sale, or imported any products that infringe any valid claim of the '653 Patent, either directly or indirectly, and DuraPlas does not and has not in the past infringed, contributed to the infringement of, or induced infringement of any valid claim of the '653 Patent either literally or under the doctrine of equivalents.

177. For example, DuraPlas's PolarPad products, which were the subject of DiversiTech's allegations of infringement as expressed directly to DuraPlas and indirectly via allegations made to certain DuraPlas customers, do not comprise each and every element of the

claims of the '653 Patent least because DuraPlas's PolarPad products do not disclose "a series of concentric [reinforcing] arc-shaped ribs attached to the bottom surface of the top deck" that are "centered on the center point of the top deck" as required by every independent claim of the '653 Patent. Ex. D at Claims 1, 3, 5, 7, 9, 11, 12.

178.    The '653 Patent discloses that "the network 130 of reinforcing ribs is attached to the bottom surface 116 of the deck 112 and occupies the space between the side walls 122. . . . The network 130 of reinforcing ribs also includes segments of a series of concentric arc-shaped ribs 136 that are centered on the center point 118," as shown in Figure 11 below:



FIG. 11

Ex. D at 7:1-10; Fig. 11.

179.    In comparison, DuraPlas's PolarPad products do not comprise any concentric arc-shaped ribs centered on the center point of a top deck. Instead, the ribs of the PolarPad products either are all rectilinear or, with respect to the four circular hubs, are neither concentric nor centered on the center point of a top deck.



DuraPlas's PolarPad products therefore cannot literally infringe any claims of the '653 Patent.

180.    DuraPlas's PolarPad products also cannot infringe any valid claim of the '653 Patent literally or under the doctrine of equivalents because the PolarPad products merely practice the prior art, including the Hef-T-Pad Prior Art.

181.    DuraPlas reserves the right to modify and expand upon its noninfringement theories as discovery progresses in this case; it shall not be estopped for noninfringement purposes by information contained in the foregoing paragraphs. The foregoing paragraphs are intended to satisfy the notice requirements of Federal Rule of Civil Procedure 8(a)(2); it does not represent DuraPlas's preliminary or final noninfringement positions.

182.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, DuraPlas is entitled to judgment from this Court finding that DuraPlas does not infringe the '653 Patent pursuant to 35 U.S.C. § 271.

### COUNT VIII – VIOLATION OF THE TEXAS ANTITRUST ACT

183.    DuraPlas repeats and realleges every allegation contained in the foregoing paragraphs as if set forth fully herein.

184.     DiversiTech's conduct as outlined in the federal antitrust violations detailed above also violates the Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code Ann. § 15.01 *et seq*.

185.     DiversiTech's conduct is willful and flagrant because DiversiTech's employees and CEO knew their conduct could be considered predatory and exclusionary and it targets DuraPlas for elimination from the relevant market.

186.     DuraPlas is entitled to an award of treble damages, recovery of its reasonable attorney's fees, and other relief available under the Texas Antitrust Act.

**COUNT IX – UNFAIR COMPETITION IN VIOLATION OF TEXAS COMMON LAW**

187.     DuraPlas repeats and realleges every allegation contained in the foregoing paragraphs as if set forth fully herein.

188.     DiversiTech's conduct is contrary to honest practice in industrial and commercial matters. DiversiTech's conduct also constitutes a violation of Texas common law.

189.     DuraPlas has suffered damages as a result of DiversiTech's conduct, including but not limited to loss of sales, dilution of the value of the brand, and loss of DuraPlas's goodwill and reputation.

**COUNT X – TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL OR BUSINESS RELATIONS**

190.     DuraPlas repeats and realleges every allegation contained in the foregoing paragraphs as if set forth fully herein.

191.     DuraPlas had numerous opportunities to enter into prospective contractual or business relations with distributors of plastic HVAC/R pads. DuraPlas has sent salespersons around the country to encourage potential customers to use DuraPlas for their plastic HVAC/R pad needs. Realizing the superior features and pricing that DuraPlas can provide, these distributors

indicated to DuraPlas that they had a great interest in contracting with DuraPlas for the purchase of its PolarPad line of plastic HVAC/R pads.

192.    DiversiTech knew that DuraPlas was in discussions with its prospective customers. Nevertheless, DiversiTech engaged in tortious, unlawful and anticompetitive conduct to interfere with DuraPlas's prospective contractual and business relations. These actions include violations of the Sherman Act, Clayton Act, and Texas Antitrust Act, as detailed above, and therefore constitute tortious interference with prospective contractual and business relations.

193.    DuraPlas has lost the opportunity to enter into prospective contractual and business relations as a result of this interference through independently tortious and wrongful conduct by DiversiTech.

194.    DiversiTech's interference with DuraPlas's prospective contractual and business relations has caused DuraPlas substantial damages, including but not limited to declining sales to targeted and current distributors, loss of goodwill, lost profits, and loss of market share.

195.    Further, DiversiTech acted intentionally and with malice for the sole purpose of excluding DuraPlas from the market.

## PRAYER FOR RELIEF

Wherefore, DuraPlas respectfully requests that the Court enter and Order and Judgment against DiversiTech as follows:

1.    For an award of DuraPlas's actual damages, including special and consequential damages in an amount to be proven at trial.

2.    For an award of exemplary damages in an amount to be proven at trial.

3.    For an award of damages in an amount to be proven at trial, to be trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, and applicable state antitrust laws, including attorneys' fees where available by statute;

4.      For a permanent injunction enjoining DiversiTech from enforcing or entering into exclusionary contracts, agreements, or arrangements that unreasonably restrain trade or foreclose competition in the relevant market, and requiring DiversiTech to take affirmative steps to restore competition;

5.      For a declaration that the claims of the '123 Patent are invalid and unenforceable;

6.      For a declaration that DuraPlas does not infringe any valid claim of the '123 Patent;

7.      For a declaration that DuraPlas does not infringe any valid claim of the '440 Patent;

8.      For a declaration that DuraPlas does not infringe any valid claim of the '653 Patent;

9.      For an order finding that this case is an exceptional case under 35 U.S.C. § 285 and/or 15 U.S.C. § 1117(a) and awarding DuraPlas its costs, expenses, and disbursements incurred in this action, including reasonable attorneys' fees as available by law to be paid by DiversiTech;

10.      For an award to DuraPlas of pre-judgment interest, post-judgment interest, and costs in this action; and

11.      For an award of such other relief to DuraPlas as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

DuraPlas demands a trial by jury on all issues so triable.

Dated:  May 26, 2025                              Respectfully submitted,


                                                  */s/Craig B. Florence*
                                                  Craig B. Florence, Texas Bar No. 07158010
                                                  Michael W. Dubner, Texas Bar No. 24027291
                                                  Stephanie L. McPhail, Texas Bar No. 24104104
                                                  FOLEY & LARDNER LLP
                                                  2021 McKinney Avenue, Suite 1600
                                                  Dallas, Texas 75201
                                                  Phone: 214.999.3000
                                                  Fax: 214.999.4667
                                                  Email:  cflorence@foley.com
                                                          mdubner@foley.com
                                                          smcphail@foley.com

                                                  Terrell Richard Miller
                                                  Texas Bar No. 24046446
                                                  FOLEY & LARDNER LLP
                                                  1000 Louisiana Street, Suite 2000
                                                  Houston, TX  77002
                                                  Phone:  713.276.5500
                                                  Fax:  713.276.5555
                                                  Email:  tmiller@foley.com

                                                  Kate E. Gehl (*pro hac vice* forthcoming)
                                                  Sarah E. Rieger (*pro hac vice* forthcoming)
                                                  FOLEY & LARDNER LLP
                                                  777 East Wisconsin Avenue
                                                  Milwaukee, WI 53202
                                                  Phone:  414.271.2400
                                                  Fax:  414.297.4900
                                                  Email:  kgehl@foley.com
                                                          srieger@foley.com

                                                  Richard G. S. Lee (*pro hac vice* forthcoming)
                                                  FOLEY & LARDNER LLP
                                                  3000 K Street, N.W., Suite 600
                                                  Washington, D.C. 20007
                                                  Phone:  202.672.5300
                                                  Fax:  202.672.5399
                                                  Email:  richard.lee@foley.com

                                                  *Attorneys for Plaintiff DuraPlas, LP*